# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania    :
                                      :
            v.                 :   No. 1455 C.D. 2015
                                        :   No. 1526 C.D. 2015
John P. Ramun,                  :   Argued: April 12, 2016
            Appellant         :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                          **FILED:  September 8, 2016**

John P. Ramun (Appellant) appeals from the order of the Court of Common Pleas of Clarion County (trial court) finding him guilty of the summary offenses of hunting over bait in violation of Section 2308(a)(8) of the Game and Wildlife Code (Code), 34 Pa. C.S. § 2308(a)(8), and unlawful taking or possessing of game or wildlife in violation of Section 2307(a) of the Code, 34 Pa. C.S. § 2307(a).  We affirm.

The events at issue in this matter took place on Saturday, November 23, 2013, the first day of Pennsylvania bear firearm season.  On that date, Appellant, a citizen of Ohio, killed a black bear on a 124-acre property he owns in Toby Township, Clarion County.  Appellant then took the bear to the Pennsylvania Game Commission (Commission) check station located at the Commission's Northwest Region Office in Franklin, Pennsylvania.  Appellant checked in the bear

and received a harvest certificate, which indicated that the bear had a live weight of 151 pounds and was female. (Reproduced Record (R.R.) 15a.) After leaving the check station, Appellant received a call from Commission staff and was told to return to the check station. When he arrived back at the check station, a Wildlife Conservation Officer (WCO) seized the black bear that Appellant had harvested and gave Appellant a property receipt that described the seized property as "one female adult black bear." (R.R. 16a.) While Appellant waited at the check station, WCO Steven James Ace first went to Appellant's property to investigate whether Appellant had hunted over bait and then met Appellant at the Franklin check station. WCO Ace and Appellant then traveled back to the property and Appellant showed WCO Ace the stand where he said he had been hunting and the gut pile where Appellant had removed the bear's entrails.

On July 17, 2014, WCO Ace issued two citations to Appellant assessing fines, costs and restitution in the amount of $4,599. (Def. Exs. 4, 5.) Following a trial before a magisterial district justice on December 17, 2014, Appellant was found guilty of both summary offenses and sentenced to pay fines, costs and restitution in the amount of $3,961.86. Appellant appealed to the Court of Common Pleas of Clarion County and the case was assigned to President Judge James G. Arner, who conducted a two-day trial on March 25 and April 9, 2015.

At trial, the Commonwealth's first witness was WCO Ace, who testified that he was first advised that bait had been left on Appellant's property in 2011; WCO Ace investigated and found bait on the property and returned again in 2012 and found bait, but on neither occasion was anyone present on the property. (3/25/15 Hearing Transcript (H.T.) at 11-12, R.R. 19a.) After receiving a tip from a wildlife conservation officer in Ohio, WCO Ace returned on October 12, 2013

2

and found two baited areas on the property. (*Id.* at 12-13, R.R. 19a-20a.) WCO Ace testified that he made at least three follow-up visits between October 12 and November 23, 2013 and discovered bait there on each occasion, including fresh corn added since the previous visit, at the locations marked on the map the Commonwealth used as a trial exhibit as "Bait Left of Range" and "Bait Elevated Barrel Stand." (*Id.* at 15-16, 115-16, R.R. 20a, 45a; Cmwlth. Exs. A, J.)

WCO Ace testified that prior to the start of the season he asked the land management officer running the Franklin check station to advise him if Appellant came in with a bear or another hunter said he harvested a bear on Appellant's property. (3/25/15 H.T. at 16-17, R.R. 20a-21a.) WCO Ace received a call on the morning of November 23, 2013 to advise him that Appellant had checked in a bear; after wrapping up with the Pennsylvania State Police on another matter, WCO Ace drove to Appellant's property arriving between 9 a.m. and 10 a.m. (*Id.* at 17-18, 51, 56, R.R. 21a, 29a-30a.) WCO Ace testified that he found corn bait at an area marked on the Commonwealth's map as "Bait on Hill"; this location was approximately 26 yards from an oil tank used as a ground blind. (*Id.* at 18-19, R.R. 21a; Cmwlth. Exs. A, B.) WCO Ace stated that the "Bait on Hill" location showed evidence of fresh corn and older corn that had been stomped into the ground, significant game activity, including animal traffic since the last leaves had fallen. (3/25/15 H.T. at 20-21, 50-51, R.R. 21a-22a, 29a; Cmwlth. Ex. C.)

WCO Ace testified that he found blood at the "Bait on Hill" location and evidence that an animal had been shot there because "something had dug into the dirt like it had been startled and taken off." (3/25/15 H.T. at 21, 24-25, R.R. 22a-23a.) WCO Ace discovered drag marks leading from "Bait on Hill" on a path over a hill approximately 80 to 100 yards, crossing a woods road and then another

20 yards to an impression in the dirt and a large amount of blood where WCO Ace believed the bear had died. (*Id.* at 24-25, R.R. 22a-23a.) WCO Ace took photographs of these locations and collected two blood samples, one from blood on a leaf in close proximity to the bait at "Bait on Hill" and the other from a leaf at the pool of blood where WCO Ace believed that the bear had died. (*Id.* at 21-22, 25-26, R.R. 22a-23a; Cmwlth Exs. B, C, D, E, F.)

WCO Ace testified that he arrived at the Franklin check station at 2 p.m. and Appellant agreed to take WCO Ace and his deputy to the location where the bear was killed; WCO Ace also looked at the seized bear briefly. (3/25/15 H.T. at 27-28, 54, R.R. 23a, 30a.) WCO Ace testified that, once arriving at the property, Appellant showed him an area where Appellant said he had done feeding in the past and then showed him a ladder tree stand, referred to on the Commonwealth map as the "Ladder Stand." (*Id.* at 33-35, R.R. 25a; Cmwlth. Ex. A.) Appellant pointed to the approximate location where he had shot the bear from the "Ladder Stand," but WCO Ace could not find evidence that an animal had been shot there; Appellant then brought WCO Ace to the gut pile and WCO Ace cut open the stomach, finding apples, shriveled grapes and corn inside. (3/25/15 H.T. at 35-38, R.R. 25a-26a; 4/9/15 H.T. at 67, R.R. 68a.) WCO Ace testified that Appellant told him that he was not aware of the bait at the "Bait on Hill" location and did not know how it got there and also said that he had placed the corn found at "Bait on Hill" after he killed the bear and was leaving his property for the year. (3/25/15 H.T. at 38-39, 48, R.R. 26a, 28a.)

WCO Ace stated that he took the two leaves he collected and placed them in paper bags and labeled them as "kill site" and "bait site" and placed the paper bags in plastic bags; later in his home office, WCO Ace took the samples out

4

of the bags to dry, then returned them to the bags, labeled them with sample numbers and the case number and sealed the bags. (*Id.* at 22-23, 26-27, 68-72, R.R. 22a-23a, 33a-34a.) Approximately one week after the bear was killed, WCO Ace also collected a third sample from the ear of the bear, which had been frozen and was stored in an evidence freezer; WCO Ace testified that he recognized the bear from the seizure tag on its ear. (*Id.* at 30-31, 76-77, R.R. 24a, 35a-36a.) WCO Ace packaged the three samples and sent them via courier to Northeast Wildlife DNA Laboratory at East Stroudsburg University on January 16, 2014. (*Id.* at 23, 26, 31, 77, R.R. 22a-24a, 36a.) WCO Ace testified that he has had DNA evidence collection training within the last five years but that he did not use chain-of-custody forms. (*Id.* at 60-61, 70, R.R. 31a-32a, 34a.)

The Commonwealth also presented the testimony of Thomas Rounsville, Jr., the former laboratory manager of the Northeast Wildlife DNA Laboratory. Rounsville testified that he received the samples in a sealed, untampered package and that he broke the seal and initialed the seals prior to testing. (*Id.* at 95-98, R.R. 40a-41a.) Rounsville performed three tests: from the first mitochondrial DNA test, he determined that the two blood samples and the ear sample were all from a black bear. (*Id.* at 98, R.R. 41a.) Second, using a series of microsatellite markers from the samples, he determined that all three samples were from the same identical bear. (*Id.* at 98-99, R.R. 41a.) And third, he performed a gender test on the ear sample that determined that the bear was a male. (*Id.* at 99, R.R. 41a.) Rounsville prepared a report for WCO Ace and then returned the samples to the Commission after several months. (*Id.* at 99-100, R.R. 41a.)

As part of his defense, Appellant testified that he purchased the property in 2007 and uses it for hunting and as a rifle range; he stated that he has

been doing supplemental feeding of game on the property in the spring and summer, which he regularly monitors with trail cameras, but he has stopped by July of each year. (4/9/15 H.T. at 6-12, R.R. 53a-54a.) Appellant testified that he arrived at the property on Friday, November 22, 2013, the last day of bear archery season, and hunted on that day from the "Ladder Stand" where no bait was present; he was unsuccessful on November 22, slept in his truck and then woke up on November 23 and hunted with a firearm from the same stand. (*Id.* at 14-17, R.R. 55a-56a.) Appellant testified that it would be impossible to see "Bait on Hill" from the "Ladder Stand" because it was more than 950 feet away with an elevation change of 100 feet. (*Id.* at 18-20, R.R. 56a; Def. Ex. 3.)

Appellant testified that he shot the bear at approximately 60-70 yards distance down the hill from the "Ladder Stand"; after being shot, the bear rolled around and proceeded along the trail to a clearing not far from the "Bait on Hill" location. (4/9/15 H.T. at 21-22, R.R. 57a.) Appellant found the bear alive, shot the bear twice more and tagged the bear. (*Id.* at 22, R.R. 57a.) Appellant was disappointed with the bear's small size; he checked between the bear's legs to determine its gender, and he was also disappointed to discover it was a female. (*Id.* at 24-25, R.R. 57a-58a.) Appellant testified that he went to get his truck, drove by the ground blind in the vicinity of the "Bait on Hill" location where he unloaded three 50-pound bags of corn for winter feeding and then he replaced the battery and memory card in the trail camera near that location. (*Id.* at 25-26, R.R. 58a.) Appellant then drove his truck to a plateau as close as he could get to where the bear had died, dragged the bear to his truck and gutted the bear, leaving the gut pile *in situ*. (*Id.* at 23-24, 26-27, R.R. 57a-58a.)

Appellant testified that the Commission staff at the check station measured the bear and examined the bear closely and would have been able to tell the bear's gender. (*Id.* at 29-30, R.R. 59a; Def. Ex. 1, R.R. 15a.) Appellant stated that WCO Ace did not come to the check station until 3:30 p.m. by which time there were 2 inches of freshly fallen snow on the ground. (4/9/15 H.T. at 35, 59, R.R. 60a, 66a.) Appellant testified that he took WCO Ace to the "Ladder Stand" and pointed out where he shot the bear and took him to the gut pile; Appellant stated that he could see apples and raisins in the bear's stomach but no corn. (*Id.* at 36-37, 59, R.R. 60a-61a, 66a.)

Appellant also presented what he represented were time-stamped photographs from the motion-detecting trail camera pointed in the direction of the corn that he testified he left out at the "Bait on Hill" site after he shot the bear. (Def. Exs. 6, 8.) These images show turkey, deer and other wildlife in the vicinity of the corn, and also appear to show the camera's field of view being obscured in three photographs taken at 1:21 p.m. and 1:22 p.m. on November 23, 2013. (Def. Ex. 6.) Appellant asserted during his testimony that these photographs show that someone placed an object over the camera and that the next photographs at 1:30 p.m. were triggered when the individual removed the object obscuring the lens. (4/9/15 H.T. at 44-45, R.R. 62a-63a.)

The trial court found Appellant guilty of the summary offenses of hunting over bait and unlawful taking or possessing of game or wildlife. The trial court found WCO Ace credible and that there was no evidence that he had any motivation to lie in order to obtain a conviction of Appellant. (Apr. 23, 2015 Trial Court Opinion at 6.) The trial court found persuasive WCO Ace's testimony regarding the precise manner in which he collected, preserved, marked and sent the

7

blood samples and ear sample. (*Id.* at 5.) Therefore, the trial court rejected the argument that WCO Ace had intentionally or mistakenly sent samples from another bear. (*Id.*) The trial court also found that there was no evidence that the DNA gender test was incorrect and therefore concluded that the error in identifying the gender of the bear must have occurred at the Franklin check station. (*Id.* at 5-6.) The trial court noted that while Appellant testified that the Commission officers made a thorough inspection of the bear, there was no evidence of what they in fact did or did not do to determine its gender. (*Id.*)

The trial court also rejected Appellant's argument that WCO Ace did not take the blood sample at the "Bait on Hill" site because he did not appear on the camera, finding that the camera being covered at 1:21 p.m. was consistent with WCO Ace's statement that he was delayed in arriving because he was helping the State Police on another matter and Appellant's testimony that WCO Ace did not arrive until 3:30 p.m. (*Id.* at 6.) The trial court found Appellant's testimony regarding the corn found by WCO Ace to be inconsistent because Appellant told WCO Ace that he was not sure who left the corn while they were at the property but testified at court that he had left the corn as he was leaving to go to the check station. (*Id.*) The trial court also found Appellant's statement regarding leaving three 50-pound bags of corn as feed on November 23, 2013 to be inconsistent with his stated past practice of leaving corn out only in the spring and summer. (*Id.*) Following his conviction, Appellant filed two timely notices of appeal, one for each offense, in the Superior Court. This matter was then transferred to this Court, and the two appeals were consolidated.

On appeal, Appellant argues that the Commonwealth did not present sufficient evidence at trial to support Appellant's conviction for hunting over bait.

Appellant asserts that the Commonwealth had no evidence to show that Appellant was hunting at the ground blind near the "Bait on Hill" location because WCO Ace admitted that he did not personally observe Appellant hunting at the ground blind and Appellant testified that he was hunting at the "Ladder Stand." Appellant also argues that there was no evidence that Appellant put corn out at the "Bait on Hill" location *before* harvesting the bear on November 23, 2013 and WCO Ace's observation of seeing bait at the location after Appellant brought the bear to the check station was consistent with Appellant's testimony that he left the corn out when leaving his property for the season.

Our scope of review in an appeal from a summary conviction is limited to whether there has been an error of law and whether competent evidence supports the trial court's findings. *Commonwealth v. Nicely,* 988 A.2d 799, 803 n.3 (Pa. Cmwlth. 2010); *Commonwealth v. Hall,* 692 A.2d 283, 284 n.2 (Pa. Cmwlth. 1997). The Commonwealth has the never-shifting burden of proving all elements of a summary offense beyond a reasonable doubt. *Nicely*, 988 A.2d at 803 n.3; *Commonwealth v. A.D.B.,* 752 A.2d 438, 443 (Pa. Cmwlth. 2000). To determine whether the evidence was sufficient to convict, the Court must determine whether, after viewing all the evidence together with all reasonable inferences therefrom in the light most favorable to the Commonwealth, the trier of fact could have found each element of the offense charged had been proven beyond a reasonable doubt. *Nicely,* 988 A.2d at 803 n.3; *Commonwealth v. Smyers*, 885 A.2d 107, 110 (Pa. Cmwlth. 2005).

Pursuant to Section 2308(a)(8) of the Code:

[I]t is unlawful for any person to hunt or aid, abet, assist or conspire to hunt any game or wildlife through the use of....[a]ny artificial or natural bait, hay, grain, fruit, nut, salt, chemical, mineral or other food as an enticement for game or wildlife,

9

> regardless of kind and quantity, or take advantage of any such area or food or bait prior to 30 days after the removal of such material and its residue. ...

34 Pa. C.S. § 2308(a)(8).[1] This Court held in *Commonwealth v. Sellinger,* 763 A.2d 525 (Pa. Cmwlth. 2000), that a criminal negligence standard, which has been referred to by the courts as a "reasonable hunter" or "negligent hunter" standard, applies to Section 2308(a)(8). 763 A.2d at 526-27. As we stated in *Sellinger*:

> a violation of [Section 2308(a)(8)] occurs regardless of whether the hunter intends to take advantage of the bait if he continues to hunt in an area after he *knows or has reason to know* that it is a baited area; even if he proceeds to hunt by walking away from the bait rather than toward it, so long as he continues to hunt. A hunter who becomes aware of the existence of bait and unloads his weapon is no longer hunting.

*Id.* at 527 (emphasis added); *see also Commonwealth v. Donovan*, 829 A.2d 759, 762 (Pa. Cmwlth. 2003). The Court in *Sellinger* declined to define a specific limit of how far a hunter or quarry must be from a baited area to evade prosecution under Section 2308(a)(8), instead defining a baited area "by its capacity to act as an effective lure for the particular hunter." 763 A.2d at 528.

---

[1] Appellant was also convicted of violating Section 2307(a) of the Code, which provides that

> It is unlawful for any person to aid, abet, attempt or conspire to hunt for or take or possess, use, transport or conceal any game or wildlife unlawfully taken or not properly marked or any part thereof, or to hunt for, trap, take, kill, transport, conceal, possess or use any game or wildlife contrary to the provisions of this title.

34 Pa. C.S. § 2307(a). The Commonwealth admits that this charge for taking, killing or possessing game or wildlife contrary to the provisions of the Code was entirely dependent on the conviction under Section 2308(a)(8). Furthermore, the only ground upon which Appellant challenges his Section 2307(a) conviction is that his conviction under Section 2308(a)(8) is invalid.

Appellant admitted that he harvested a bear on his property on November 23, 2013, and there is no dispute that corn was present at the "Bait on Hill" site when WCO Ace and Appellant visited the property later on November 23, 2013. Therefore, the Commonwealth was required to show only that Appellant knew or had reason to know that corn was present at the "Bait on Hill" site at the time that the bear was shot and that Appellant shot the bear near this location. In support of its case, the Commonwealth introduced photographs of the "Bait on Hill" location and WCO Ace testified that in addition to the pile of fresh corn present at the "Bait on Hill" site, there were kernels of older corn pressed down into the mud. (3/25/15 H.T. at 20-21, R.R. 21a-22a; Cmwlth. Exs. B, C.) WCO Ace stated that three well-worn game trails converged at this location and there was "a major amount of wildlife activity" focused on the bait site as demonstrated by the fact that the ground had been excavated, roots were pulled up around the bait site and the leaves had been disturbed. (3/25/15 H.T. at 20-21, R.R. 21a-22a.) WCO Ace concluded that "[t]hrough my training and experience, I would certainly say that the evidence found [at the "Bait on Hill" site] shows that there was corn there prior to" Appellant shooting the bear. (3/25/15 H.T. at 49, R.R. 29a.)

WCO Ace testified that he collected a blood sample on a leaf in close proximity to the pile of corn and marked the spot on one of the Commonwealth's photographs that showed the corn. (3/25/15 H.T. at 22, R.R. 22a; Cmwlth. Ex. B.) WCO Ace sent this sample out for testing and the testing conducted by an independent wildlife DNA laboratory revealed that this blood came from the same black bear as the blood collected at a site WCO Ace determined to be the site the bear died, approximately 100 yards away from the "Bait on Hill" site, and came from the same black bear seized from Appellant on the day of harvest. (3/25/15

11

H.T. at 98-99, R.R. 41a.) WCO Ace further testified that when Appellant showed him the bear's gut pile, he cut open the bear's stomach and found corn in the stomach. (4/9/15 H.T. at 67, R.R. 68a.)

This testimony by WCO Ace, which was supported by the photographs taken at the scene and DNA tests, showed that corn was present at the "Bait on Hill" site prior to any new corn being placed when Appellant left the property and that Appellant shot the bear in close proximity to the corn. The trial court found WCO Ace's testimony to be credible and rejected Appellant's testimony that he shot the bear at the "Ladder Stand" and no corn was placed out until after he had concluded hunting for the season. As the finder of fact in this matter, the trial court had the exclusive authority to weigh the evidence and make credibility determinations and was entitled to believe all, part, or none of the evidence before it. *Commonwealth v. Griscavage*, 517 A.2d 1256, 1257 (Pa. 1986); *Commonwealth v. Spontarelli*, 791 A.2d 1254, 1258 (Pa. Cmwlth. 2002). Furthermore, the fact that WCO Ace did not personally observe Appellant hunting in a baited area is immaterial because the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. *Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013); *Donovan*, 829 A.2d at 763. Accordingly, we conclude that this evidence presented by the Commonwealth was sufficient to support the summary conviction for hunting over bait by the trial court.

Appellant next argues that the trial court's conclusion that the Commission officers made a mistake in recording Appellant's bear as a female on the harvest certificate and property seizure receipt was an unreasonable inference in light of the testimony of Appellant regarding both his and the Commission officers' close inspection of the bear to determine its gender. A criminal

12

conviction may be based upon the evidence presented by the prosecution and any reasonable inference therefrom. *Nicely,* 988 A.2d at 803 n.3; *Smyers,* 885 A.2d at 110. An inference is a process of reasoning by which a fact or proposition is deduced as the logical consequence from the other facts and conditions proved at trial and not based on mere suspicion or conjecture. *Commonwealth v. Wojdak*, 466 A.2d 991, 996 (Pa. 1983); *Commonwealth v. Wagaman*, 627 A.2d 735, 740 (Pa. Super. 1993). The test to determine whether an inference is reasonable is whether the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." *Wojdak*, 466 A.2d at 996 (citing *Turner v. United States*, 396 U.S. 398, 405 (1970)); *see also Wagaman*, 627 A.2d at 740-41.

Appellant's argument that the trial court unreasonably concluded that Commission officers erred in concluding that the bear was a female is misplaced. As part of its case in chief, the Commonwealth was not required to prove that the bear was not a female or that Commission staff erred in recording that the bear was a female on the harvest certificate or property seizure receipt. Instead, the Commonwealth was only required to prove that Appellant killed a bear, that bait was placed in a close enough proximity to the bear that it would act as an effective lure to the bear and that Appellant knew or should have known that he was hunting in a baited area. The harvest certificate and property seizure receipt were introduced by Appellant as part of his defense, and therefore it was for the trial court as the trier of fact to determine whether this evidence raised a reasonable doubt such that Appellant should have been acquitted. The trial court found this evidence unpersuasive, noting that Appellant did not procure the testimony of the Commission officers themselves to determine what steps they took to discern the bear's gender and that Appellant's testimony conflicted with the results of the

13

DNA test showing the bear to be a male and WCO Ace's detailed testimony regarding the procedure for collection and shipping of the samples to the DNA laboratory. What weight should be afforded the evidence is a determination within the trial court's discretion alone, and we may not disturb it on appeal.

Finally, Appellant argues that the trial court improperly shifted the burden to Appellant to disprove the Commonwealth's case, contravening the constitutionally guaranteed presumption of innocence to which he was entitled. *See Commonwealth v. Bishop*, 372 A.2d 794, 796 (Pa. 1977) ("It is beyond cavil that an accused in a criminal case is clothed with a presumption of innocence and that the burden of proof in establishing guilt rests with the Commonwealth."). Specifically, Appellant asserts that in its opinion the trial court placed the burden on him to show that WCO Ace had a motivation to lie or falsify evidence and that the trial court suggested that Appellant had the burden to show that the DNA tests were invalid or call the Commission staff who filled out the harvest certificate and property seizure receipt to explain why they recorded that the bear was female.[2]

---

[2] The trial court stated:

> In order for me to find that the DNA samples were from a different bear, I would need to find that [the] WCO sent three samples from another bear for testing, either intentionally or by mistake. There is no evidence that Ace had any motivation to lie or to intentionally use other evidence to prosecute the Defendant.
>
> ...
>
> Further there is no indication that the DNA gender test showing the bear is a male is inaccurate. The Defendant offered no evidence to refute the validity of the test. This leads to the conclusion that the Game Commission officer who filled out the forms at the check-in station was mistaken that the bear was a female. While the Defendant testified that the officers at Franklin made a very thorough inspection of the bear, there was no testimony from the officers themselves. There is no evidence on what the officers did or did not do before noting on the form that the bear was a female.

(Opinion at 5-6.)

14

We disagree with Appellant's interpretation of the trial court's decision. There is no indication in the trial court's opinion that it employed a burden-shifting technique that would have required Appellant to disprove the Commonwealth's *prima facie* case. Rather, it is apparent that the trial court was assessing the evidence and arguments raised by Appellant in his defense and determining whether they raised a reasonable doubt that should cause the trial court to acquit Appellant.

Accordingly, the order of the trial court convicting Appellant of the summary offenses of hunting over bait and unlawful taking or possessing of game or wildlife is affirmed.

_____
JAMES GARDNER COLINS, Senior Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Commonwealth of Pennsylvania :
:
       v. : No. 1455 C.D. 2015
: No. 1526 C.D. 2015
John P. Ramun, :
       Appellant :

**ORDER**

AND NOW, this 8th day of September, 2016, it is hereby ORDERED that the order of the Court of Common Pleas of Clarion County is hereby AFFIRMED.

 

_____
JAMES GARDNER COLINS, Senior Judge